May it please the Court, I'm Aaron Colangelo on behalf of the Appellant Center. Did you say yes or no? Well, yes we do, Your Honor. It's not in the record here. But what's at stake in this appeal is the viability of citizen enforcement of Clean Water Act discharge permits. The County and the Flood Control District own and operate a storm drain system, and they allow pollutants to be introduced into the system. They discharge pollutants from that system, from their storm drains, into rivers and into the ocean. They have no right to discharge pollutants. They can only discharge pursuant to a permit, and they have a permit. That permit prohibits violations of certain pollutant limits in the four rivers at issue in this case. How do the pollutants get into the system through the storm drains? How do they get into the system? Yes, that's right, Your Honor. Through the storm drains. That's right, storm water runoff goes into the storm drains, and they're discharged from the Counties and Flood Control Districts, outfalls into the rivers. That's correct, Your Honor. I would appreciate your addressing the evidentiary issue that the District Court dealt with. Let's assume for purposes of our discussion that I agree with you about the law, that the County and the District are liable to the degree that the evidence shows that they have permitted these things to happen. The District Court, as you know, found that there was inadequate evidence, even after a request for more evidence, I think in virtually every case. In particular, the County, with respect to all four rivers, has no, as far as I can tell, any direct evidence that the County, which controls only a small portion of the MS-4 for its unincorporated areas, contributed to the observed exceedances. Is that wrong? Well, yes, Your Honor, that is wrong. Okay. Both as a matter of fact and as a matter of law. Okay, tell me why. Well, first, as a matter of law, Your Honor, the monitoring scheme that the County and the District proposed that is incorporated in the permit determines their liability as a matter of law. Now, what do you rely upon for that? Several things. First, the Clean Water Act, in Section 1342A2, says that every permit says that the administrator shall require conditions necessary to assure compliance, including conditions on monitoring and information and data collection. Okay. Now, in this case, as I understand it, the District Court found that the mass emission stations were placed, sometimes nobody even knew where they were, I gather, and that there was no evidence that showed that the County had contributed. Maybe I'm misunderstanding this. If that's correct, even under 1342A2, there still has to be evidence to show that a discharge has occurred, does there not? Well, yes, Your Honor. Let me get to the evidence of a discharge. Okay. And then I'll get back to the law. Okay. The evidence of a discharge, first, the permit includes a finding of fact, on page 182 of the record, that the County and the Flood Control District discharged pollutants to the rivers at issue in the case. Okay. I don't have any question about that. Okay. I don't have any question about that. But it also says in the permit, and I believe under the law, that you're responsible for what you put into it. Now, if you have ownership of something, then you take control for everything, wherever it comes from, to some degree, under the law, as I understand it. But in this particular case, where there's no, as I understand it, evidence that the County, for example, doesn't own that portion of the MS4, where it's coming down, doesn't have any role with respect to the four rivers. Am I misunderstanding that evidence? Did the district court find something different? Well, no, Your Honor. The district court did not find something different. But the district court did overlook both evidence that we submitted and the law. So, first, on the evidence, the permit includes a finding that they discharged these pollutants, and they've admitted to discharging these pollutants to these rivers from their storm drain system, upstream of the monitoring stations. Okay. There is no factual dispute about the existence of a discharge. The only dispute is where to measure their liability. Let me be sure I understand correctly. You're saying that the County of Los Angeles, for example, has admitted that it discharges into the whole system, or just a portion of the system? They've admitted, and I can point to the place in the record if that would be helpful. Please do, yeah. It's on page 171 of the excerpts of record, and also 165. Okay. And at those locations, they've admitted that both the county and the flood control district, that their storm sewer system discharges to these rivers upstream of the monitoring stations. Okay. They've also admitted, this is beginning on page 64 of the record, that they convey every one of the pollutants at issue in this case to these rivers. Right. Because you've got the channel, basically. Well, both the county and the district, but yes, because of the channel. They own the vast majority of the system now, especially the flood control district. For example, and this is what I'm struggling with here. Let's say there are four different sections of this. I realize it's a massive, massive system. But let's say the county in this unincorporated area has a little piece of one of four. Okay. It wouldn't be responsible, under your view, for two, three, and four, would it? Well, no. No, not at all. Okay. They're responsible because they are discharging upstream of these monitoring stations in each of the four. The county is? The county and the flood control district. Okay. I want you to mix them up here, because they're different. Okay. Yes, the county. They're different. On its own, admitted to discharging upstream of each of the monitoring stations in each of these four rivers. Okay, and that's what you cited to me a minute ago? Yes, 165 and 170. Okay, so you're saying that the record will show that the county admits that it discharges, under the terms of the Clean Water Act and the permit, an unlawful waste that flows into a navigable water into each of the four channels, I call it. That's right. Is that correct? Yes, that's correct. They don't admit that it's an unlawful waste. Okay. That's our argument, but they admit to discharging. The county admits to discharging from their storm sewer system to each of these four rivers upstream of the monitoring. Okay, so from your perspective, it's not a question of discharge. It's a question of what is being discharged is unlawful. Is that right? Well, Your Honor, what I think the question is, is where to measure their compliance with the permit limits. Okay. It's clear that there are clear limits in the permit. They can't contribute to pollution violations in these rivers for certain pollutants, lead, cyanide, fecal bacteria. Right. That's clear. Right. It's also clear that they proposed a monitoring scheme under which they would be held liable. Every permit, including every municipal stormwater permit, must include sufficient monitoring to determine compliance and noncompliance with permit limits. And under EPA regulations, that monitoring can be at a representative location. The regulations expressly say it need not be conducted directly at an outfall. As I understand it, the district court was unable to identify where the mass emissions stations, i.e. the measuring places for the Santa Clara River and the Malibu Creek flames occurred in, either in the MS-4 or in the respective rivers. Is that correct? Well, he said that at the first summary judgment argument, he said there was no evidence of where those stations were. Right. We submitted supplemental evidence showing where they were. Okay. And they're downstream of both the county's and the district's discharge points. Uh-huh. The district court agreed that the mass emissions stations established violations. He said this is clear and undisputed evidence that there are violations of permit limits. Uh-huh. But he said it was... President's who's responsible. Exactly. Okay. And in our view, the county and the flood control district proposed these monitoring stations. As a legal matter, they are representative of their discharges. So your NRDC's position is that if the county joined with the district in setting these things up, the fact that what is measured there is not tied to what the county puts in there. They're responsible for a pro rata share of all of it, or are they responsible for all of it? Are you arguing kind of joint and several liability here? Not quite, Your Honor. And the permit actually answers that question too. The permit says that you're responsible for your own waste, right? That's exactly right. And that goes to the remedy. There is a clear blueprint in the permit for how to equitably apportion their pro rata... How does that work in this case? I don't mean to monopolize this conversation here, but how does it work? You get the mass emissions station in a couple of instances where the county doesn't own the land. It's not involved in it. It's not part of the district, I gather, in that setting. How does it come to be responsible for discharge in that setting? Well, we did not sue over any violations for which the county is not responsible. Okay. So from your perspective, if there's one it's responsible for, whatever the district is responsible for, the county is also responsible? Well, not quite, Your Honor. They're responsible because here's the necessary and sufficient factual evidence. They admit to discharging from their storm drains above these monitoring stations. The monitoring stations show undisputed violations of permit limits year after year after year. Okay. Now let's assume for a minute that I don't know how you measure these things, but let's just say that the quantity that the county admits to discharging is one unit, whatever it is. But the total coming out of there is 2,000 units. Does the county bear responsibility for the one unit, or is it something else? Well, that would be worked out during remedy proceedings. The case was bifurcated below. And they would be responsible only for cleaning up their share. They are clearly not responsible and could not be held responsible under the law for other parties' contributions, and the permit makes that clear. And so this is what the district court was struggling with, is that here you've got these public entities. You've got a $15, $16 billion problem here. And the law is pretty clear that they're responsible, but nobody knows how much is coming out and nobody knows who put it in. That's what we're dealing with here, isn't it? Well, that's correct, for the most part, Your Honor. The missing piece is that under the law and under this permit, it's their burden to establish, to identify and remediate their contribution. Okay, so let's say they don't. As I understand it, they take the position that they don't have sufficient information to quantify anything. What happens then under the Clean Water Act? Well, let me explain how the permit answers that. The permit says once violations are identified at the monitoring stations, it's their job to, and this is where it gets to just the pro rata share, it's their job to strengthen pollution control measures only in the areas within their jurisdiction, only over the part of the system for which they are the operator. In other words, they have to strengthen their pollution control over their own infrastructure. Okay, now that's a little confusing in this sense. I understood you to say that in ER 171 and 165 and so on, that the county, for example, has confessed that it has discharged pollutants into all four rivers and into the MS-4, and yet it's basically, even with its unincorporated areas, it's a relatively small portion of the whole thing. Under those circumstances, how do you measure what the county is responsible for? And under the permit, the permit lays out a blueprint for exactly that. It is their job to identify. They have to conduct source identification, find out where the pollutants are coming from. And if they don't do that, then what happens? Well, then we have unabated water pollution with no accountability, which is what's happening here. So then you bring a lawsuit, a citizen lawsuit, and you say this is not happening. And what is it specifically that you're asking the district court, and of course now us, to do? Well, right now, the case was bifurcated. We're only asking the court to find that they're liable based on the monitoring scheme that they proposed and that every permit must contain, and which shows undisputed violations. On remedy, we'll be asking the district court to implement the permit's requirement that they conduct source identification, conduct enhanced sampling to figure out where the pollutants in particular are coming from, what activities, what parts of the county, what infrastructure they're coming through, and then implement pollution control measures to deal with the problem. So we really don't have the remedy portion before us now at all, right? That's correct. You want us to find, number one, that the law is as you indicate, and number two, that based upon these ER references that you've given us, that the county and certainly the district have confessed error, basically, and then the only question is how much and how it gets remedied. That's exactly right, and remedy will be sorted out during subsequent proceedings in district court. And I would say only further that the permit explains how to do that. It will lead to and it contemplates an equitable apportionment of their share. Let me mention a few other record sites that further illustrate that they're discharging these pollutants. First, the district court found that they admit to conveying these pollutants to the rivers at issue. He made a finding of fact. Do you recall where that is in the record? It's ER 17. They did not dispute that on appeal. And also, Your Honor, ER 64 is a portion of a deposition transcript in which their responsible party, the 30B6 witness for both defendants, the flood control district and the county, admitted that their storm sewer systems convey every one of these pollutants. I went through the list with him of every pollutant at issue in the case, cyanide, lead, fecal bacteria. He said we convey all of those. He even said on page 64 that every single thing that is measured at a mass emission station has been conveyed by the flood control district storm sewer system. So from your perspective, the district court getting off on the fact that there was an inability to locate the mass emission stations or get the readings is really not part of the current proceeding. That's part of the remedy proceeding, right? That's exactly right. That's exactly right. Our position is that, and I can give the regulations and the statutory citations which would be helpful, but every permit, including a municipal stormwater permit, must include monitoring sufficient to determine compliance. That's central to a meaningful implementation. You see, what would be helpful, as far as I'm concerned, would be a chart. Of course, I know where these rivers are and how this is broken so you can visualize it, all right? Yes. And where these measuring stations now are, maybe what one looks like, maybe what future monitoring sites might look like, and what remedial action the county and the district are now taking. Remedial action, aren't they? They're not, Your Honor. They're not doing anything? No, Your Honor. They have said, and this is in the record, too, there is no monitoring that you could ever conduct that would show that we're liable, even if the river is on fire. We could not be held accountable under this permit. There is no monitoring. All right. And I can point to the record and say that's who you are. It would be helpful to have, you know, so you can, well, aren't there requirements like in county parking lots that there are devices there, the drainage where oil drippings are captured? Aren't they? That's correct, Your Honor. Aren't they aware about that? That's correct. So that doesn't go into, that isn't going to go into the storm drain system. So they're doing things about that, right? That's correct, Your Honor. There are separate requirements in the permit. They're called programmatic requirements. And that's not an issue in this case right now. What we have are undisputed violations of the limits. Well, you just talked about they're not doing anything, but they are doing things. Things are being done. Things are being done to capture some of the larger pieces of debris and all that that are going in. Aren't plants, businesses that deal in toxic materials, they're being monitored. That's correct, Your Honor. They're implementing. We've had big violators right here in Pasadena. So, you see, it would make life a lot easier, I think, if you had a good overall view of the system and what's in place and how things are measured. We know that when you get a big storm, a lot of it's coming off the mountains. And we've seen our flood control. The L.A. River is a raging, maniacal body of water. It's pretty hard for them to do much about that. There are dead horses in there. There are dead horses in there.  There are dead babies in there. We do. We get dead babies in the sewer system, too. And not too many, but we get some. So I would think you'd want to have an overall view because you come up with these concepts that for someone who's just looking at that stuff for the first time, they've got to kind of visualize themselves what they think all this is going to look like. Well, I'm over my time, Your Honor, but I'd love to respond. I'm sorry, I'm just trying to give you some ideas. I remember when we did those spotted owl cases. We had, oh, we have a forest here, and we have a forest there, and then we need this corridor. So you visualize a corridor as a narrow space. Turns out the corridor is the whole forest. Nobody told us that. And when we finally found out by asking questions, I can't almost speak for myself, but I'm sure I spoke to the others. They were surprised, too. So you've got to give the judges or the triers of fact this overall picture. Make your life easier. Make their lives easier. Let me try to answer that question, Your Honor, and also respond to your earlier point. When I said that the county and the flood control district are not responding to these violations, what I meant was they admit that their monitoring shows violations of permit limits, but their argument is we are not accountable, and we could never be held accountable, and therefore the violations continue, and they have continued for the entire complaint period and until today. Well, I say that because, I don't know, $15, $20 billion are probably involved, maybe more than that. Well, Your Honor, we haven't gotten into that at all. Well, we know that's going to cost tons and tons of money. It also causes. And that makes them reticent because where are we going to get the money? Well, Your Honor, first, it causes documented and undisputed harm, hundreds of millions to the regional economy, harm to the environment, illnesses every year. That's undisputed. That's true. Nobody's disputing that. Furthermore, Your Honor. Nobody's disputing that, but we have a huge problem here, and we have a huge problem throughout the nation, and one of these days we're going to have to take care of it, but keep putting it off, putting it off. Let me try to answer that. For a lot of reasons. It's like we put off solving our problem with education in the public schools. We have a lot of problems. So all I'm saying is it would be helpful to kind of get an overview of this system and some idea of how the problems are going to be remedied and how monitoring is done. Where are these monitoring stations? Are they just in the center of the river someplace? Well, they're on the sides of the river. The sides of the river. And they sample the storm sewer system. Two of them are within the flood control district storm sewer system because it's a channelized portion of the river. Let me try just to paint a picture to answer Your Honor's question. Well, how do they get the samples when you have a dry system and out in the valley you're just restricted to kind of a narrow channel that runs down. The rest of it's dry and trucks are driving up and down and all that. I don't know, Your Honor, but that illustrates our argument that the point of the compliance monitoring requirement statute is to make enforcement of violations swift and simple. The legislative history is clear that there should be swift and straightforward judgment of liability based on self-reporting of violations. And courts have routinely said, including this court in Sierra Club v. Union Oil, that during an enforcement proceeding the court will not reconsider or reevaluate the technical adequacy of the monitoring scheme in the permit. And that is exactly what the district judge did. In his view, the mass emission monitoring was technically inadequate. And this was the only issue on which he ruled against us on this claim. His view was the mass emission monitoring was inadequate as a technical matter because it was not conducted directly from their outfalls, directly from the end of their pipe. And the answer to that, Your Honors, is that the regulations say it need not be conducted there. They proposed this monitoring scheme. And not only that, they proposed to be regulated with 84 other co-permit fee cities. They could have opted out and gotten their own permit with monitoring unique to them, as the city of Long Beach did. Long Beach has its own permit with monitoring that is unique just to Long Beach. And they are held responsible for their violations. Long Beach is a progressive city in many ways. If I may, Your Honor, I'd like a minute to reply to all. Take a seat. Thank you. Who's your co-counsel today? He needs a smile. He's starting to look like Dick Cheney. That's Mr. Burhan of our firm, Your Honor. Don't go to Nigeria. You sure you are? Because this involves oil companies. May it please the court, Howard Guest on behalf of the defendants in Appalese. I want to answer some of the court's questions, factual questions that have been raised. Let me just take one minute to set the scene. This is not a remarkable case. As a general rule, a plaintiff has to introduce evidence to prove their case. The plaintiffs allege that the county and the district violated the stormwater permit. They specifically allege that they violated Part 2.1 of the permit. That permit provision says discharges from their MS-4 shall not cause or contribute to an exceedance of water quality standards. So that's what this case is about. Did the plaintiffs introduce evidence that a discharge from either the county or the district's MS-4 caused or contributed to an exceedance of water quality standards? The district court found that the plaintiffs did not introduce any such evidence. In their briefs, the plaintiffs do not dispute that they had any evidence that showed any pollutant that was discharged from the county or the district's MS-4. Let me go back here, though. Your opposing counsel indicates that the district and the county indicated that you would not be responsible for any discharge even if the river was on fire. Is that an accurate statement? No. It isn't? No. Would you be responsible if it were on fire? Well, first of all, within the county jurisdiction, it's in the fire department out there. Yeah, I understand that. Would you be responsible under the Clean Water Act? If a discharge from the county's MS-4 or if a discharge from the district's MS-4 caused that exceedance and caused the fire. When you say caused it, the reality is clearly an MS-4 is a point source, and all of these things run into the Pacific Ocean, so you've got navigable waters. So the reality is when you get discharge coming down the MS-4, which is owned by the district and or the county, you have a discharge under the act. The real issue here, is it not, is the question of proof as opposed to liability. Well, let me answer that question. Okay. And, of course, we're talking about proof of liability. I'm talking about liability as a matter of law. In other words, as a matter of law, under the Clean Water Act and under the terms of the permit, are you all disputing, meaning the county and the district, are you disputing the fact that if you own part of the MS-4, which is a point source, that's going into the Pacific Ocean, that there is a discharge, and if it contains effluence or other parts of the discharge that are in excess of lawful limits, that that is a violation of the Clean Water Act? If the permit says you can't discharge it in excess of the limits, it's a violation of the Clean Water Act and a violation of the permit. There's no dispute about that. Okay, all right. So let me talk about the evidence. Okay, so in this case, then, your opposing counsel gave me some citations, ER-171, 165, and also on ER-64, where I understand him to say that the county and the district have agreed that they are discharging illegal effluence into the MS-4 and, in the county's case, into all of those. Do you agree with his characterization of the record on that? No. Okay. And I invite the court to look at this. We'll look. So let me tell you what the testimony was, because it was a testimony of an official from the district. Okay. The testimony is that the county does discharge above the monitoring, mass emission monitoring standards. Right. There was no testimony as to what pollutants were in that discharge. Okay. All right, so from the county's standpoint, there is nothing in the record that talks about what discharges come from the county's MS-4, other than the fact that it does discharge. So all he said was the bold statement, there is a discharge, but it was not characterized in any way. It could have been some pure water from a mountain source, for all we know, right? That's correct. He was asked, does the county discharge above the mass emission station? And the answer was yes. Okay, so the quality of the discharge is not discussed. That's right. So then we get back to proof again. Okay, that's right. That's exactly right. And the district court looked at the evidence very carefully and invited again twice for the plaintiffs to introduce evidence, both with respect to the county and the district. And the plaintiffs here, other than what they just cited to the record, they didn't say that in the brief. They didn't argue that they had evidence of these discharges. They argued that they should be allowed to use the mass emission station monitoring in lieu of, and that should be attributed to them. But I want to answer with respect to the district, too, because we've got the evidence-free question about the district. The witness said with respect to the district, two of the mass emission stations are in the district's infrastructure. Right. So for that reason, any pollutants that are measured at the mass emission stations are in our infrastructure. And we have monitoring data that shows these pollutants, so it shows it. Right. He did not say that there was a discharge from the district's MS-4 that caused or contributed to those exceedances of water quality standards. This is the district court? This is the district, the employee from the district. I'm talking about not referring to the district. I'm talking about the flood control district. Okay. Well, let me be sure I'm understanding your position on this. Let's say that the mass emission station reflected that there were exceedances, a significant amount in terms of some toxic metals or something like that, within the two MS-4s that the district has. You would be responsible for that, right? We are responsible for that if it violates water quality standards when it enters the Pacific Ocean. Okay, so really what you're saying is that this ought to all be measured down by the ocean rather than up at the mass emission station. But this is important. Yeah. This is important. Yeah. Because the plaintiffs don't ensue. They don't contend that there was a violation of water quality standards at the Pacific Ocean. They don't say that the district, that's not in their complaint. That's not in this case. Because the Pacific Ocean has different water quality standards than what is at the mass emission station, which is an inland water body and fresh water. The plaintiffs are saying that there was a discharge by the district above the mass emission station that caused or contributed to the exceedance of water quality standards that was being measured at the mass emission station. And so even though the district might be responsible when it eventually gets discharged into the Pacific Ocean, one, you don't know whether it's violating water quality standards there, and two, that's not part of this case. Because they didn't plead it and they didn't try to prove anything. No one has alleged, no one has contended that the district violates water quality standards in the Pacific Ocean with respect to these four watershed claims. There's another claim that's not an issue in this case. But nobody has contended that with respect to these four watersheds. So then the district court was still faced with the issue, was there something coming out of a district pipe or discharge that was causing it to exceed? You know, my colleague on the left here wrote a case in Portland that made it very clear. It doesn't have to come out of your pipe. If it comes out of your MS4, you've got a problem. Well, from the... In other words, the law is pretty clear, wouldn't you agree that... I mean, obviously, if the county or the district has a pipe and there are pollutants coming out of it, no problem. But wherever it's coming from, if you have pollution that is in excess of whatever the law requires and you get it into the MS4 and it's going to a navigable water, you have some responsibility there, right? We don't dispute this. If it's in the flight control district's MS4, even though they did not generate the pollutant, create it. Once it's in the system, they're responsible for it. I understand. That's not true. I'd be sure we're in agreement on that. Right. The whole issue is, as the district court found, there's no evidence, not just that there's pollution in the system, but there's no evidence that a discharge from the flight control district's infrastructure, pipe, whatever, caused or contributed to the exceedances that were being measured at the mass emission station. Now, why was that correct? For several reasons. First of all, the plaintiffs argued that you should use the monitoring at the mass emission stations in lieu of any evidence. But what do we know? One, we know that the person who was responsible for putting in the permit and designing this testified that that was not the purpose of the mass emission stations to measure the discharge of any particular discharger, but it was to do what it says, to measure the mass of what's going through. Second, we know- But you're talking about the quantity of liquids that are going through. And the quantity of pollutants. Oh, okay. And quantity of pollutants. Okay. Secondly, but it's the quantity. Secondly, we know, and there's evidence in the record and was undisputed, that it's not just the district, flight control district, it's not just the county that's discharging is being measured, but there is, A, all the natural water from the rain that comes down gets channeled in there. In the LA River, there was over 1,000 permitted industrial stormwater dischargers who might be discharging. There was publicly owned treatment waste water plants that could be discharged. We had permits to allow the discharge above the water quality standards. Construction sites that were all coming in there. All of this water, as well as the other cities. Now, as well as this, all of this water is collected and measured at the mass emission site. But if the measuring site is within MS4, how is the district not responsible for it? It might be responsible for it when it gets discharged to the Pacific Ocean. Okay. No, no. There's no discharge at the MS4. There's no discharge that's occurring at the MS4. So the flight control district... Is that because there's no navigable water? It's not because there's no water. It's just a location as it's traveling along through the Los Angeles River. Right. And the Los Angeles River is not a navigable water? No, it is a navigable water. Right. But there's no discharge occurring there because at that point it's not moving from one water body to another. But if you own the MS4 and it's tied into the Los Angeles River, isn't that, per se, a discharge into a navigable water? No. The measuring point, there's no discharge that's occurring at the measuring point of the mass emission station because it's not moving from one water body or place to another navigable water. Wait a minute. You're saying the discharge doesn't happen until it hits the ocean? Yes. I am saying that. And that's not part of this case. And it's probably not part of this case because if you were looking at the... If you were looking at the water quality standards, you would be looking at different water quality standards for the Pacific Ocean. And you don't know whether those are being followed or not. And the plaintiffs aren't... The plaintiffs... Now, there are also discharges above the mass emission stations. But, for example, the city of Los Angeles has pipes that come into the Los Angeles River. They are discharging above the mass emission station. But the plaintiffs did not identify any discharge by the county or the district that caused or contributed to the exceedances that were being measured at the mass emission station. The evidence wasn't there. Now, this is an important point because I don't want the court to, I don't want to... to jump to an area that really was not part of the case. We agree that the Flood Control District is responsible for what's in the system. And the permit says you shall not discharge from your system a discharge that causes or contributes to exceedance of water quality standards. There's no discharge occurring at the mass emission station. There might be a discharge when that water body gets down to the L.A. Harbor or the Pacific Ocean. But the stuff that's measured within MS-4 doesn't get diverted somewhere. It's got to go into the river, doesn't it? The stuff that's... well, we're talking about what's in the river to begin with. Yes, it stays in the river. But it doesn't... No, no, no. The stuff that's at the measuring site in your MS-4 doesn't go anywhere other than the Los Angeles River, does it? It stays there. That's correct. So it stays there. But what's not at issue in this case is whether that stuff violated the permit when it reached the Pacific Ocean. That's very important. That's not in this case. If, though, following up on Judge Hollett's point, if you have a violation that from your perspective only occurs when the discharge reaches the Pacific Ocean, but if you have the same pollutants and they are in the MS-4, which is owned by the district and or the county, and the mass of pollutants measuring area reflects that, and it ultimately can only go into the ocean, because that's just the way it's set up, why isn't that enough? Because, first of all, you have different water quality standards. We're talking about X pound of metals per volume of water, but that's different in the Pacific Ocean than in the... Say the water quality standards, though, within MS-4, aren't there water quality standards within that, even before it gets to the ocean? Yes. If you find that the pollution that is measured in MS-4 before it ever gets to the ocean far exceeds the lawful limit, why would not the county and the district be liable for that, even if it never got to the ocean? Okay, well, let's separate two things first. Let's separate the county and the flood control district. Okay, because the county is only responsible for what it is, and what we're talking about now is the mass emission monitoring station in the district infrastructure for two rivers, not Malibu, not Santa Clara. I understand. All right, so let's talk about your question, if I may rephrase it, why wouldn't the flood control district be responsible for that? And the district court addressed that issue in its decision, and the Supreme Court has addressed this issue. And the issue is you regulate the discharge, okay? That's what requires the permit. So you have to have a discharge, and the district said, where is the discharge coming from? And the district court looked at the evidence, and the evidence was undisputed that there was no discharge occurring at the mass emission station. So the fact that there might be an exceedance at the mass emission station does not prove that the district violated the permit, because the permit prohibits a discharge, which is defined to be a discharge of a pollutant into a navigable water, and there's no discharge occurring there. Now, I don't want to lose this point, though, because when you get to the Pacific Ocean... A navigable water is what, the Pacific Ocean? Well, a navigable water, the Los Angeles River, let me use this example, is a navigable water. And so when the city of Los Angeles discharges into the Los Angeles River, it is discharging. But the district is not discharging just when the water is moving by the mass emission station. There's no discharge by the district occurring there. The district is conveying that water in a channel that eventually goes down to the ocean. So from the district's perspective, when you think about the LA River infrastructure, the discharge occurs at the Pacific Ocean. Now, again, let me repeat, the Pacific Ocean is not part of this case. Why? One, because you have different water quality standards. Two, you can't assume that just because it exceeds a water quality standard upstream that that will be true downstream because your volumes of water differ and you have more sources that are coming in as you're moving downstream. So you can't assume that just because there's an exceedance, one, you have different water quality standards, but even if you had the same water quality standard, you can't assume that that would be the same when you got to the Pacific Ocean. Let me ask you this, then. The Los Angeles River, San Gabriel River are navigable water areas, right? Right. The MS4, on the other hand, is a man-made structure. It's not a navigable river. Why would not a discharge occur when it comes from the MS4 into the Los Angeles River or intertwined? Well, first of all, we have an unusual situation right here, which is the Los Angeles River is cement. I understand. So, in fact, the Los Angeles River is both a river and part of a floodplain. I think that's my point. To the degree you've combined them, haven't you, on an ongoing basis, hasn't whatever the MS4 is also in the river? There is a discharge into the river. No, if you think about the city of Los Angeles again, and what this is is you have the flood control district, which has like the trunk of the tree, and all different cities have the different branches. They discharge into the trunk. All right. So they, although the district has certain branches too, but to be simple. So when they are discharging into the LA River, that's a discharge for them. The flood control district is not discharging there because it's not moving it from one distinct water body to another. I don't understand that at all. Okay. All right. Well, let me try again because this is important. The flood control channel is a large channel. It's an open channel. Are you talking about the river? The river, right. It's an open channel. You have pipes from the city of Los Angeles that collect water from the streets. They go into bigger pipes, bigger pipes. Finally, there's an outlet to the channel, to the Los Angeles River. Okay. No dispute. That's a discharge. Okay. The Los Angeles River has a big channel that's moving water downstream. If it wasn't cemented, it would be natural, natural, but it's now cemented for flood control purposes. It's moving that downstream. It's not moving it. It hasn't moved the water yet. The flood control district hasn't yet moved the water into any other water body. It's just moving it along the Los Angeles River. So in the Supreme Court case of South Florida where they say in order to have a discharge, you have to move it from one distinct water body to another. If you move it just in the same water body, you don't have a discharge. But it leaves MS-4 at some point and winds up in the river. It leaves the city of Los Angeles's MS-4 or at least other permits' MS-4, but that's not who's the party in this case. The district's MS-4 does not go into the Los Angeles River? Well, the district might have some of that, but there's, yes, there is some district pipes that might go into the Los Angeles River. Where did the rest of them go? No, no, let's assume that they go into the Los Angeles River. Okay, but there's no evidence. Again, you're sort of following the district court's reasoning. Okay, the district court said, okay, what's the evidence that the discharge from that district court district, the flood control district's pipes that went into the LA River, what's the evidence that that discharge caused or contributed to an exceedance? And the district court said, there is no evidence. And the plaintiffs don't give you any evidence. The plaintiffs don't say, here's a sample that says that it comes from this. The plaintiffs say, I don't have to give you that evidence. The plaintiffs say. You're saying, you're saying actually that the water that's in that channel, as far as the district is concerned, is all virgin water. And whatever contaminants come in, or exceedances, or whatever you want to call them, are coming in laterally from the different cities and other permittees. And as far as the district is concerned, whether it is discharging of pollutants into the ocean, that's going to depend on what the standards are for water quality in the ocean. Somebody would take a sample of the ocean. That's what you're saying, isn't it? That's right. So why can't you just say it then? You're better than I am. No, I'm not. I'm not trying to confuse anybody. Not even myself. See, that's why a nice diagram. You've got plenty of diagrams that show all these things. If you had to explain all this to the New York Times, you think they're going to read all these words. They're going to have a way of explaining it visually. But you guys never learn that. Well, let me just say that there are some maps in the record that don't give you a full map of the flood control system, but in the supplemental excerpt of the record at 222 through 226, there is some maps which show different permittees, but also show where the mass emission stations are. And also, not in the excerpt of the record, but on the declaration of Mark Pestrello, which I think is number 37 in the docket, he has some maps which show the different jurisdictions in the San Gabriel River watershed. I think we understand it now. Okay. I probably have used up my time. Plenty of it, then. Lots of exceedances here. Yeah. I do think there's a difference between liability and remedy. It's not right to hold somebody liable if there's no proof that they're liable. You can't just say we'll deal with it in a remedy phase. And there are a few other aspects of the description of the facts that we disagree with. You covered those. Okay. Thank you very much. Okay. I'll just give you a couple of minutes because we're way over. Thank you, Your Honor. Let me just start by clearing up a crucial factual misstatement. It is not the case that the district owns only the channel. The district also owns thousands of miles of pipes, underground pipes, three-feet diameter pipes that themselves discharge into each of these rivers. They admitted that. It's a finding in the record. They do not own only the channel. So the picture that the Defendant's Counsel painted of a trunk owned by the Flood Control District and lateral inputs... Well, he said there were other pipes. Okay. That's right. But they own not just some of the branches, virtually all of them, more than all of the other cities combined. That's a finding by the district court. So they own not just the channel that is the channelized portion of the... LA River. So from your perspective, then, the fact that it comes from all these pipes is a discharge into, say, the Los Angeles River, which is a navigable water. You don't have to get to the Pacific Ocean. That's exactly right, and we're challenging violations in these rivers. Right, and that's where you then get to the mass emissions statement, and you're saying that the evidence that is there, since there is an admitted, in quotes, discharge into a navigable water, is sufficient to show that it has been violated, that the permit has been violated. That's correct, Your Honor. Not just sufficient, but that it must, as a matter of law. The permit and the statute require representative monitoring. They have so many pipes, thousands, it would be impossible to monitor their discharges individually. And that's why the permit provides for, and the statute provides for, representative monitoring conducted in string that is, by law, and this is 40 CFR 122.41J, representative of their discharges. Do you have, in your discovery, do you have the records from these four different monitoring stations? Oh, yes, we do, Your Honor. So you know exactly what's there. That's correct, Your Honor, and that's what the violations are based on. The Flood Control District files an annual monitoring report, and they're obligated to highlight the violations at those stations, and they do. They did. Those are the 300-some violations that we challenged here. They submitted annual reports every year saying, here are the violations for each of these constituents. So what you're really saying is that the pipes that discharge directly into the, that a very large percentage of the pipes that discharge into this big channel are part of the district system, and if they weren't part of the district system, and if they weren't there, and if they weren't discharging, then the water that ultimately reaches the Pacific would, whatever that point is, would be a lot cleaner. That's absolutely correct, Your Honor. That's what you're saying. That's correct. So that their discharges out of these other pipes, like the others, are really contributing in a significant manner to what is discharged into the ocean. That's absolutely correct. Not just to the ocean. I have a picture. Okay. Let me make two more quick points, Your Honor. First, the district and the county did testify unequivocally that they could never be held accountable under this permit. And on page 321 of the excerpts, I asked the 30B6 witness, what if they were monitoring from the end of your pipe that showed heavily polluted flows violating a standard? Is it still your view you would not be contributing to an exceedance? And he said, yes. I said, what if those discharges were literally on fire? And he said, yes, we would still not be contributing. And what that means is that, in their view, there is no monitoring. This is clear and unequivocal in the testimony. There is no monitoring that could ever be done to demonstrate their violations, and that violates the Clean Water Act and the language of this permit. These were the stations that they proposed and they agreed to. Okay. What's the next point? Well, finally, Your Honor, just quickly, they pointed to other sources upstream as potential contributors, and the district court properly found that those other sources are irrelevant because the permit prohibits contributing to an exceedance, not just those who are the sole cause. So it's undisputed that there are other sources, but that's not relevant because the permit makes it unlawful to cause or contribute to a violation of the standards in these rivers. And the monitoring stations that they set up from which they sample and report the results demonstrate, as a matter of law, that their discharges are violating the permit limits. All right. Thank you. Thank you. And we appreciate your argument. It was very, very helpful. And just for your edification, we have heard, I'm talking about the panel that occupied this courtroom, 40 appeals this week. Forty appeals. That's how you get old fast. I didn't hear 40, so I'm not so old. So we'll adjourn. Thank you. All rise. The court for this session stands adjourned.
judges: Holland, Pregerson, Smith M.